THISSEN, Justice (dissenting).
I agree with the court that Minn. Stat. § 60A.41(a) (2016) is ambiguous, but it is there that my view of the case diverges. I respectfully dissent from the court's conclusion that the Legislature's intended meaning of "insured" is "any party covered by some part of the insurance policy at issue." In contrast to the majority, I conclude that a person is an "insured" under section 60A.41(a) only when the person seeking immunity under the antisubrogation rule is, in fact, covered for the loss at issue. I would remand this case to the district court to determine whether appellant Depositors Insurance Company's policy covers respondent Craig Dollansky for the loss for which Depositors is seeking subrogation.
This dispute is the fallout from the apparent spontaneous combustion of a recreational vehicle (RV) on Interstate 80 in Nebraska. The driver, Craig Dollansky, had earlier leased the RV from Karavan Trailers, Inc. The destruction of the RV was total and Karavan suffered a loss of $204,895.05.
When Dollansky leased the RV several weeks before the fire, he signed a short, two-page rental contract with Karavan ("Karavan-Dollansky Agreement"). The Karavan-Dollansky Agreement provided, in relevant part:
[Dollansky] is responsible for all damage or loss, including damage or loss [he] cause[s] to others.
... [Dollansky] agrees to indemnify [Karavan], defend [Karavan], and hold [Karavan] harmless from all claims, liability, cost and attorney fees incurred by [Karavan] resulting from, or arising out of, this rental and [Dollansky's] use of the Vehicle.
... [Dollansky] is responsible for all damage to the Vehicle, missing equipment, and [Karavan's] administrative expenses connected with damage claim, regardless of whether or not [Dollansky] is at fault.
Further, Dollansky agreed to-and did-provide Karavan with proof that Dollansky had vehicle liability, collision, and comprehensive insurance covering Dollansky, Karavan, and the RV. Dollansky secured this coverage through a rider with his automobile insurer, American Family Insurance Company. Indeed, Karavan initially submitted a claim to American Family and American Family covered Karavan's $5,000 deductible under the Depositors policy but denied the remainder of the claim. American Family has provided legal representation to Dollansky at trial and on appeal in this case.
*694 To recover its losses, Karavan undoubtedly could have sued Dollansky under the Karavan-Dollansky Agreement. But Karavan instead sought coverage from its own insurer, Depositors. Depositors honored its insurance contract and paid Karavan $204,895.05 to cover the loss of the RV.
Depositors then stepped into the shoes of its insured, Karavan, and filed a subrogation action against Dollansky under breach-of-contract and bailment theories.[1] Dollansky, who acknowledged that he had never reviewed Karavan's insurance policy with Depositors nor knew its terms, responded by asserting that he was an "insured" under the Depositors policy. Dollansky thus claimed that the antisubrogation rule set forth in Minn. Stat. § 60A.41(a) prohibited Depositors from suing him.
The term "insured" is defined in Section V of the Depositors policy as "any person qualifying as an insured in the Who Is An Insured provision of the applicable coverage ." (Emphasis added.) Like many automobile-insurance policies, the Depositors policy provides two distinct forms of applicable coverage: liability coverage for bodily injury and personal-property loss and comprehensive and collision coverage for damage to the vehicle itself.
The "liability coverage" is set forth in Section II of the Depositors policy: "We will pay all sums an 'insured' legally must pay as damages because of ... 'property damage' to which the insurance applies [tangible property] and resulting from ... use of a covered 'auto.' "
The Who Is An Insured provision in Section II in turn provides:
The following are "Insureds":
a. You for any covered "auto".
b. Anyone else while using with your permission a covered "auto" you own, hire, or borrow [with exceptions not relevant to this case.]
c. Anyone liable for the conduct of an "insured" described above but only to the extent of that liability.
Section II also includes a "contractual exclusion," which provides that the liability coverage "does not apply to ... [l]iability assumed under any contract or agreement." That exclusion includes certain specified exceptions.
The distinct comprehensive coverage-or "physical damage coverage"-provisions are found in Section III of the Depositors policy:
We will pay for [direct and accidental loss or damage] to a covered "auto" or its equipment under:
a. Comprehensive Coverage.
From any cause except:
(1) The covered "auto's" collision with another object; or
(2) The covered "auto's" overturn.
b. Specified Causes of Loss Coverage.
Caused by:
(1) Fire, lightning or explosion....
Section III also provides separately for collision coverage for damage to the vehicle. Notably, unlike Section II, Section III does not include a Who Is An Insured provision. In fact, the word "insured" appears nowhere in Section III.
I.
The dispute between the parties boils down to whether, under Minn. Stat. § 60A.41(a), Dollansky is Depositors' "insured," which would allow him to assert *695 the antisubrogation rule to bar Depositors from recovering from him in subrogation of Karavan's rights under the Karavan-Dollansky Agreement. The court holds that Dollansky is an "insured" simply because he could qualify as an insured under the Depositors policy under some potential set of circumstances-even if those circumstances do not exist in the present case. In contrast, I conclude that a person is an "insured" under section 60A.41(a) only when the person seeking protection under the antisubrogation rule is, in fact, covered for the loss or risk for which the insurance company is seeking to recover in its subrogation action.
I agree with the court that the plain text of Minn. Stat. § 60A.41(a) does not resolve the question before us. As the court points out, the Legislature provided no definition of the word "insured," and the term could have many different meanings, depending on the context. The assured confidence of the concurrence that this court absolutely knows what the Legislature intended in using the words "its insured" is misplaced. The goal of a plain-meaning analysis is ultimately to understand the intent of the Legislature, and the concurrence points to nothing in the language of the statute that suggests that the words "its insured" means "any person possibly insured under any part of the policy even if that part of the policy is not at issue in the case." Many Minnesotans would not consider themselves "insured" for a boat accident if their insurance policy expressly excluded coverage for boat accidents, but that is essentially the understanding that the concurrence attributes to the statutory language and the Legislature. In short, the concurrence's criticism and rejection of the reasonable alternative readings of the words "its insured" apply with equal force to the reading advanced by the concurrence itself. As such, we are left to ferret out the Legislature's intent using other interpretive tools.
When interpreting an ambiguous statute, "we may look to the purpose of the law." Marks v. Comm'r of Revenue , 875 N.W.2d 321, 326 (Minn. 2016) ; see Minn. Stat. § 645.16 (2016). The purpose of the antisubrogation rule is to prevent an insurer from seeking to recover from its insured for losses for which the insurance company agreed to provide coverage in exchange for the premiums paid by the insured. See 16 Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 224:3 (3d ed. 2000). Conversely, when an insurance company does not agree to provide coverage for a particular loss, the antisubrogation rule is not implicated. Cf. id. As such, it is illogical to divorce the application of the statutory antisubrogation rule in section 60A.41 from any analysis of whether the purported "insured" was actually covered for the particular loss.
That conclusion finds ample support in our longstanding common-law antisubrogation precedent that predates the enactment of section 60A.41(a). See Kremerv. Kremer , 912 N.W.2d 617, 623 (Minn. 2018) ("We presume that statutes are consistent with the common law, and that the Legislature does not intend to abrogate or modify a common-law rule unless it does so by express wording or necessary implication of the statute."). In Dairyland Insurance Co. v. Munson , 292 Minn. 141, 193 N.W.2d 476 (1972), and U.S. Fire Insurance Co. v. Ammala , 334 N.W.2d 631 (Minn. 1983), we held that the antisubrogation rule does not apply when the insurer's policy does not actually cover the purported insured for the loss for which the insurer is seeking subrogation. That is true even when the policy covers the purported insured for other types of losses. In other words, we adopted the common-sense and unsurprising rule that a person is an "insured" for *696 purposes of the antisubrogation rule only when the policy actually insures the person for the loss in question.[2] There is nothing express or necessarily implied in the language of section 60A.41(a) to suggest that the Legislature had any intent to abrogate or modify this common-law precedent. See Kremer , 912 N.W.2d at 623. This result has the added practical benefit of avoiding the confusion of having one antisubrogation rule under the common law and a different rule under the statute.[3]
Dairyland is remarkably similar to this case. Dairyland Insurance Company had issued an automobile-insurance policy to Charles Healy. 193 N.W.2d at 478. The insurance policy provided distinct coverage for "bodily injury and property damage" and for "collision or upset" for damage to the car itself. Id. The policy extended coverage to permissive users for "bodily injury and property damage." Id . at 478-79 (noting that the policy "significantly omit[ted] mention of collision coverage in defining the permissive user as an insured with respect to bodily injury and property damage liability"); see id. at 478 n.1. However, "[b]y express definition contained in the policy ... the permittee or bailee [was] not included as an insured with respect to collision or upset damage." Id. at 478. In other words, although the Dairyland policy covered a permissive driver for "bodily injury and property damage," it did not cover "collision or upset" damage to the vehicle itself. Id.
Healy loaned his car to Stephen Munson. Id. at 477. While using the car, Munson rolled it over, and the car sustained damages totaling $1,503. Id. Healy recovered his loss from Dairyland under the collision-coverage section of the policy. See id. Dairyland then filed a subrogation action *697 against Munson. Id. In response, Munson (or more accurately, his insurer Reliance[4] ) asserted the antisubrogation rule, arguing that "Munson was an 'insured' under the terms of Dairyland's policy." Id. at 477-78. We rejected the argument. See id. at 479. After examining the language of the Dairyland policy, we concluded that Munson was insured as a permissive user under only the liability section of the Dairyland policy; he was not an insured under the collision-coverage section of the Dairyland policy. See id. And because the loss in the case was covered under the collision-coverage section, Munson could not be considered an "insured" for purposes of the antisubrogation rule . Id. at 478-79.
The court's attempt to distinguish Dairyland is perplexing. In Dairyland , the court clearly states that the Dairyland "policy protect[ed] the permissive user from [bodily injury and property damage] risks" and, as such, Munson was an "insured" (in precisely the broad sense that the majority uses in the current case) under that part of the policy. Id. at 478 & n.1 (quoting the language of the policy). Critical to the Dairyland court, however, the Dairyland policy did not provide the permissive-user coverage for the "collision and upset damage," which was at issue in the case. Id. at 478. As such, the Dairyland court did not apply the antisubrogation bar. The essential point is this: Had the Dairyland court adopted the rule articulated by the court in this case-that a person can assert the antisubrogation rule simply because he could qualify as an insured under some part of an insurance policy under some potential set of circumstances, even if those circumstances do not exist in the present case-the Dairyland court would have reached the opposite conclusion and allowed Munson to claim immunity from subrogation because Munson clearly was an insured under some part of the Dairyland policy.
Ammala stands for the same proposition. Erland Ammala, a subcontractor on a construction project, caused substantial damage when he struck a building with a backhoe. Ammala , 334 N.W.2d at 632-33. The general contractor had contractually required Ammala to obtain primary "general liability insurance and comprehensive automobile liability insurance." Id. at 633. Ammala obtained such coverage from Farm Bureau Mutual Insurance Company. Id. Much like Dollansky, Ammala had agreed to indemnify the general contractor for any damages it incurred as a result of Ammala's work. Id. Finally, the general contractor purchased a builder's risk insurance policy from U.S. Fire Insurance Company for itself and for all subcontractors. Id. The U.S. Fire policy listed Ammala as a named insured, but stated that *698 coverage extended only to losses not covered by the subcontractor's own insurance policy. Id.
After Ammala's backhoe accident, U.S. Fire covered the general contractor's loss and then sued Ammala for negligence. Id. We rejected Ammala's claim that the antisubrogation rule applied, reasoning that Ammala's coverage under the builder's risk policy existed "only to the extent that [Ammala's] own policy with Farm Bureau did not provide coverage." Id . at 635. Indeed, because Ammala would not be an insured under the U.S. Fire policy for the loss for which U.S. Fire sought subrogation-even though he was clearly an insured under the U.S. Fire policy for some losses, and a named insured at that-we determined that the antisubrogation rule was irrelevant and inapplicable. Id . at 634.[5]
The court's alternate conclusion that section 60A.41(a) provides immunity to an insured simply because he could qualify as an insured under the Depositors policy under some potential set of circumstances-even if those circumstances do not exist in the present case-rests primarily on the doctrine that ambiguities in an insurance policy "are generally resolved in favor of the insured." But that is a doctrine that guides how courts are to interpret contracts ; not a tool to ascertain the Legislature's intent in enacting a statute , which is at issue in this case. See, e.g. , Staffing Specifix, Inc. v. Tempworks Mgmt. Servs., Inc. , 913 N.W.2d 687, 693 (Minn. 2018) (discussing the canon of contra proferentem , which is the "rule that ambiguous contract terms are to be construed against the drafter" (emphasis added) ); Nathe Bros. v. Am. Nat'l Fire Ins. Co. , 615 N.W.2d 341, 344 (Minn. 2000) (stating that "the interpretation of insurance polic[ies] and statutory language" are both "questions of law," but that only "ambiguities in a policy are generally resolved in favor of the insured"). That distinction is important. The reality is that sometimes the Legislature enacts an insurance statute with the intent that it be read broadly to protect the rights of insureds. Other times, the Legislature intends to extend the protections offered insureds, but only in a limited manner. (And, of course, sometimes the Legislature passes laws intended to help insurance companies and not insureds.) In this case, due to the frustrating paucity of legislative history and the textual ambiguity noted by the court, we simply do not know whether the Legislature intended maximalist protection of insureds by imposing coverage beyond the categories of losses the insurer agreed to cover. Indeed, as discussed above, there are strong reasons to conclude that is not the case. But we should not simply presume it. In short, adopting an interpretive presumption that the Legislature always intends that insurance statutes should be read broadly to protect the rights of insureds is a significant doctrinal shift and one not consistent with legislative practices.
*699 In sum, the court's conclusion is contrary to our clear precedent and opens the door to a significant expansion that reaches far beyond the purposes and interests that the antisubrogation rule seeks to protect. While I am sympathetic to the court's desire to find a result that will protect Dollansky and other insureds, at the end of the day, it is not the judiciary's role to create coverage that was not paid for and does not exist under the policy. See Midwest Family Mut. Ins. Co. v. Wolters , 831 N.W.2d 628, 638 (Minn. 2013) (noting that the place to settle public-policy issues-even if the result is "attractive"-is in the marketplace or by legislative action). Yet, that is what the majority allows in this case because its decision could require insurance companies to cover such losses.[6] Further, I see nothing in the statute or the court's decision to suggest that the Legislature intended such a broad expansion of the antisubrogation rule. The antisubrogation rule bars subrogation claims against only those insureds who are, in fact, covered by the policy for the loss at issue.
II.
I turn now to the question of whether Dollansky was covered by the Depositors policy for the $204,895.05 loss that Depositors paid. Dollansky appears to claim that because Section II of the policy requires Depositors to "pay all sums an 'Insured' legally must pay as damages ... resulting from ... use of a covered 'auto' " and because Depositors (as subrogee of Karavan) is now seeking "damages" from him under the Karavan-Dollansky Agreement, he should have the benefit of antisubrogation rule. But that result is far from clear.
First, it seems to be an open question whether a reasonable person, insured as a permissive driver, would fairly expect the meaning of Section II to allow Dollansky to take advantage of the fortuity that he signed a contract stating that he would cover any damage to Karavan's RV as the basis for arguing that he now does not have to honor that very promise . See Midwest Family Mut. Ins. Co. , 831 N.W.2d at 634 (" 'Provisions in an insurance policy are to be interpreted according to both plain, ordinary sense and what a reasonable person in the position of the insured would have understood the words to mean.' " (quoting Farmers Home Mut. Ins. Co. v. Lill , 332 N.W.2d 635, 637 (Minn. 1983) ) ). Section II requires Depositors to "pay all sums an 'Insured' legally must pay as damages ... caused by an 'accident' ...." (Emphasis added.) The *700 damages that Depositors (standing in the shoes of Karavan) seeks to recover from Dollansky arguably are not the result of the accident. As a result of the accident, Dollansky neither suffered a loss nor was injured. And Dollansky neither owned the destroyed vehicle nor was exposed to third-party tort damages caused by a "happening that is unexpected and unintended." See McIntosh v. State Farm Mut. Auto. Ins. Co. , 488 N.W.2d 476, 478 (Minn. 1992) (defining "accident" for purposes of automobile-insurance policies). Had Dollansky not signed the Karavan-Dollansky Agreement, there would be no case here. The only damages that Dollansky must pay were caused by, and arise from, Dollansky's failure to honor his contractual promises. Moreover, the purpose of extending automobile liability coverage to permissive drivers through omnibus clauses is to both ensure compensation for third parties who suffer bodily injury or property damage and to protect named insureds and permissive drivers against such claims. See Milbank Mut. Ins. Co. v. U.S. Fid. & Guar. Co. , 332 N.W.2d 160, 166 (Minn. 1983) ; 8 Russ & Segalla, supra , § 111:1. Arguably, that purpose is not served when the damages suffered do not arise from a third-party claim against a person insured under the policy.
Second, even if Section II applies here, Section II.B.2 of the policy includes a "contractual" exclusion from coverage: "This insurance does not apply to ... [l]iability assumed under any contract or agreement." Because Dollansky seeks coverage for "liability assumed under a contract or agreement," one reasonable interpretation of the exclusion would be to bar coverage to Dollansky under Section II. However, that exclusion is subject to two exceptions: (1) liability "[a]ssumed in a contract or agreement that is an 'insured contract,' " as that term is defined in the policy, and (2) liability the "insured" would have in the absence of the contract or agreement. Dollansky bears the burden of proving that one of those two exceptions revives his claim of coverage. SCSC Corp. v. Allied Mut. Ins. Co. , 536 N.W.2d 305, 314 (Minn. 1995) ("[O]nce the insurer shows the application of an exclusion clause, the burden of proof shifts back to the insured because the exception to the exclusion 'restores' coverage for which the insured bears the burden of proof."), overruled on other grounds by Bahr v. Boise Cascade Corp. , 766 N.W.2d 910 (Minn. 2009). There is scant evidence in the record or the parties' legal arguments concerning the applicability of either of the two exceptions to the exclusion, certainly not enough for us to conclude that Dollansky carried his burden to show that one of the exceptions applies.
Finally, the loss actually suffered here-the spontaneous combustion that destroyed the RV-most reasonably falls under the "physical damage" or comprehensive coverage of Section III of the Depositors policy, which covered direct and accidental loss or damage to the RV, and specifically loss or damage "[c]aused by ... fire, lightning or explosion." A reasonable reading of the policy suggests that Dollansky was not an insured under Section III, a common-sense result because Dollansky did not own the RV and would suffer no loss if it were destroyed. See Carlson v. Allstate Ins. Co. , 749 N.W.2d 41, 45 (Minn. 2008) (stating that the plain language of the insurance policy controls); Sherburne Land Co. v. Eells , 92 Minn. 114, 99 N.W. 419, 419 (1904) (providing that we apply common sense in reading and construing contracts). Indeed, the word "insured" is not found in Section III. Further, the term "insured" is defined in Section V as "any person or organization qualifying as an insured in the Who Is An Insured provision of the applicable coverage ." (Emphasis added.) The language *701 suggests that both the parties and the district court should look to the distinct types of "applicable coverage" (i.e., liability under Section II or "property damage" under Section III) to determine whether a person is insured for that type of coverage. There is no "Who Is An Insured" provision in Section III. In notable contrast, the term "insured" is used in Section II, the liability coverage section, and the determinative definition of "Who Is An Insured" appears only in Section II.
In short, serious questions exist about whether Dollansky is, in fact, covered for this loss under the Depositors policy. Due to the manner in which this case was resolved below and its posture before this court, however, those questions have not been fully addressed by the parties. This case was litigated before the district court and before the appellate courts as though the primary question was whether Dollansky was an "insured" or "named insured." See Depositors Ins. Co. v. Dollansky , 905 N.W.2d 513, 516-18 (Minn. App. 2017). But the issue is actually whether Dollansky is an insured under the applicable coverage section of the Depositors policy. The parties have not had the chance to address the following issues: (1) Whether Dollansky carried his burden to establish a prima facie case of coverage; (2) if so, whether Depositors carried its burden to prove that a policy exclusion applies; and (3) if so, whether Dollansky carried his burden to prove an exception to the exclusion. See SCSC Corp. , 536 N.W.2d at 311, 314.
Accordingly, although contract interpretation is a question of law, which we review de novo, Kremer , 912 N.W.2d at 626, I conclude that, based on the incomplete record and lack of briefing on the central legal question, fairness to the parties dictates a remand to the district court for further development of the relevant facts.[7]
III.
For the foregoing reasons, I would reverse the court of appeals and remand to the district court for further proceedings to determine whether Dollansky is an "insured" for the loss or risk for which Depositors seeks to recover in its subrogation claim, and therefore is entitled to the protections of the antisubrogation rule. I therefore respectfully dissent.

At oral argument, Depositors conceded that it was not claiming that the fire resulted from Dollansky's lack of care and, as such, conceded the bailment claim.

In so holding, we have been in accord with other jurisdictions. See LaSalle Nat'l Bank v. Mass. Bay Ins. Co. , 958 F.Supp. 384, 386-88 (N.D. Ill. 1997) (antisubrogation rule does not preclude insurer from asserting subrogation claim against its own insured where policy does not cover risk at issue); Highlands Ins. Co. v. Fischer , 122 Ariz. 394, 595 P.2d 186, 188 (Ariz. Ct. App. 1979) (where permissive driver without fault was involved in single car accident that destroyed vehicle, permissive user was not "insured" for purposes of antisubrogation rule because omnibus coverage in liability portion of policy did not apply to collision policy); Gardner v. Baker , No. CA 85-295, 1986 WL 1632, at *1-3 (Ark. Ct. App. Feb. 5, 1986) ; Commerce Ins. Co. v. Empire Fire & Marine Ins. Co ., 71 Mass.App.Ct. 164, 879 N.E.2d 1272, 1276-77 (2008) ; Universal Underwriters Grp. v. Heibel , 386 N.J.Super. 307, 901 A.2d 398, 402-06 (2006) ; Millennium Holdings LLC v. Glidden Co. , 27 N.Y.3d 406, 53 N.E.3d 723, 729 (2016) (emphasizing that the antisubrogation rule "requires that the insurer seek to enforce its right of subrogation against that covered party on a risk insured by the policy " (emphasis added) ); State v. Schenectady Hardware & Elec. Co. , 223 A.D.2d 783, 636 N.Y.S.2d 861, 863 (1996) (antisubrogation rule does not apply when there is no coverage for the purported insured for the actual loss); Travelers Ins. Cos. v. Dickey , 799 P.2d 625, 629 (Okla. 1990) ("In short, assuming the [individual asserting the antisubrogation rule] was a co-insured ... against some losses, the attributes of that status would not afford him immunity from subrogation coextensive with the owner's entire coverage."); see also 16 Russ & Segalla, supra , § 224.38 ("Given the public policies which underlie the [antisubrogation] rule, however, a more difficult case is presented when the policy is of a type that extends, or arguably extends, coverage to various persons under some of its provisions, but not all of them.... In many instances, the antisubrogation rule has been held inapplicable to bar an insurer's subrogation action against a third party which is insured for some purposes, where the subrogation claim involves risks or losses for which the third party is not, in fact, covered by the policy." (footnote omitted) ).

The court asserts that its interpretation "is consistent with the limited common law on the topic that existed" before section 60A.41(a)'s enactment. I am not sure what common law the court is referencing as there is no citation to any cases or other support.

After Dairyland sued him, Munson tendered the claim to his insurance company, Reliance, which refused to defend on the ground that there was no coverage under its policy. Id . Munson interpleaded Reliance and the district court held that Munson was entitled to coverage and defense under the terms of his policy with Reliance. Id. Based on the record in this case, it is unclear whether Dollansky tendered a claim to American Family. Unlike Munson, Dollansky chose not to interplead American Family. But American Family did pay Karavan for partial losses under its policy thereby acknowledging some liability, counsel for American Family represented Dollansky in this litigation, and there was an indication at oral argument and in the record that American Family conceded that its policy provided coverage to Dollansky in this case.
A real underlying issue in this case is whether Depositors or American Family is the primary insurer for this loss, an issue noted at summary judgment. Due to the litigation choices of the parties, that issue is not before the court. But that procedural fact provides no reason to disrupt our established antisubrogation jurisprudence.

The Ammala court remanded the case to the district court to determine whether Ammala was covered by the Farm Bureau policy. Id. at 635. That was important but not for the reason cited by the court in footnote 3. If Ammala was not covered by the Farm Bureau policy, he in fact would be covered by the U.S. Fire policy under the specific language of the U.S. Fire policy. Nothing in the opinion stands for the proposition that "the appropriate source of payment is an insurance company, not the insured person." Supra at 690-91, n.3. Instead, the decision rests firmly on the legal principle that a person is an insured for purposes of the antisubrogation rule only if the policy actually insures the person for the loss in question. See Ammala , 334 N.W.2d at 634 (stating "the general rule" that a person "is not liable as a subrogee unless the policy coverage does not extend to the type of damage" at issue).

In asserting that its ruling "creates no coverage that did not already exist," the court relies solely on "Depositors' admission that Dollansky was covered in part by the insurance policy." Supra at 692. But that conclusion simply begs the question of whether the insurance policy covers the loss at issue. Although Depositors acknowledged that if Dollansky had hit another vehicle while driving the RV and that third party sued Dollansky for damages, Dollansky would be covered under Section II, those are not the facts in this case. And as set forth in more detail above, under the circumstances of this case, there is a strong and reasonable argument that the Depositors policy as written does not cover the loss for which Depositors seeks recovery from Dollansky.
This is also not a case where a family member or friend is using an RV or borrowing property when a loss occurs. Under those circumstances, in which the parties presumably did not enter into a contract under which the friend or family member agreed to assume responsibility for all loss and damage, it is hard to see what basis the insurance company would have for asserting a claim against the family member or friend. Further, there is no suggestion by the parties in this case that this is a contract of adhesion. The Karavan-Dollansky Agreement was a short, one-and-one-half-page document with clear terms covering Dollansky's considered choice to rent the RV for an extended period of time for personal use.

See Living Word Bible Camp v. Cty. of Itasca , 829 N.W.2d 404, 414 (Minn. 2013) ("Based on our deferential standard of review, remand is necessary to allow the tax court to apply the law to the facts before it."); Paidar v. Hughes , 615 N.W.2d 276, 282 n.6 (Minn. 2000) (remanding "for the district court to make a new factual determination based on the correct legal standard" where the district court previously had not reached a particular factual issue); see also Remodeling Dimensions, Inc. v. Integrity Mut. Ins. Co. , 819 N.W.2d 602, 619 (Minn. 2012) (remanding for "further development of the record in the district court" instead of answering legal questions based on an incomplete record, particularly where burden-shifting was involved); Onvoy, Inc. v. SHAL, LLC , 669 N.W.2d 344, 356 (Minn. 2003) (remanding to the district court because "[a]t this stage in the proceedings, [the parties] have not had the opportunity to develop a record" on an issue involving burden-shifting).